All rise. The United States Court of Appeal for the Federal Circuit is now in open-ended session. I now say to the United States and its Honorable Court. Good morning. No, good afternoon. Good afternoon. This case number, first case is 05-14818-1432. Cordis Corporation v. Boston Scientific. Mr. Glarner. Good afternoon, Your Honor. I'm happy to be here representing Cordis this afternoon. There are two basic errors in the decision below that require reversal. And one of those relates to inequitable conduct. The other relates to the issue of literal infringement. I'd like to begin by discussing the issue of inequitable conduct. In particular, the issue of inequitable conduct insofar as it relates to the 370 patent, which is the one patent that's being enforced now in this appeal. Cordis acquired the application for the 370 patent in 1998. When it acquired that patent, one of the first things that it did was gather all of the relevant prior art, the arguably relevant prior art, and cite it in an IDS. That IDS was cited in May of 1998. One of the references that Cordis cited was the Hillstead 516 patent. The examiner considered Hillstead 516, issued no objections over it, and the 370 patent issued after consideration. When you say the examiner considered it, the examiner, I don't recall the examiner discussing. The examiner did not discuss it. You say considered because of the indication that. . . The indication that he considered it, which under the case law in MPEPA creates a presumption that he did in fact consider it. He notated that he had considered it among the references. The patent did issue with Hillstead being submitted. There's no suggestion that Cordis or anyone else committed any inequitable conduct during the 370 prosecution. Hillstead was fully disclosed, and as Your Honor noted, the examiner checked off that he had considered Hillstead during prosecution. Despite the disclosure of Hillstead, what happened in this case is that the district court held that the 370 patent was unenforceable because the Hillstead patent had not been disclosed in a separate and different patent. The 312 patent. And your point is that pharmacy under pharmacia, the two should be considered separately. That's right. Aren't at least the facts in pharmacia different than they are here? I mean the court said a lot of things, but one of the things that the district court did seemingly rely on was that the 504 had already issued. And that was not the case here, correct? That's not the case here. The alleged inequitable conduct preceded the issuance of the 370 patent. That's absolutely right. But what pharmacia did do is it surveyed this court's entire case law and it found no case whatsoever correctly where a patent was found to be unenforceable due to inequitable conduct in a separate patent unless the patent in suit, the patent itself, had itself been obtained by inequitable conduct. The only cases in which this court, so there are absolutely no cases in which a patent where a particular reference was disclosed was held to be unenforceable on the basis of non-disclosure of that reference in a separate patent. And in pharmacia the court surveyed the case law and made quite clear that in that situation the separate patent won't be unenforceable, will not be unenforceable unless that separate patent was itself procured by inequitable conduct. Then are you saying that there is just never an instance in which there will be taint which would be applicable only, well, setting aside cases in which there is actually inequitable conduct with respect to the second patent, which in which case taint is virtually irrelevant? In cases of non-disclosure, the answer to that would be yes. I believe if the problem in the first patent was non-disclosure and there is a disclosure in the second patent, I believe that the disclosure itself is a complete cure for the earlier non-disclosure because it allows the examiner to consider the previously undisclosed reference  You might have a very different situation where the inequitable conduct was an affirmative misrepresentation rather than a non-disclosure because the affirmative misrepresentation could include statements or create impressions that somehow might be relevant to the prosecution of the second patent. But this case only deals with non-disclosure. And where there is a non-disclosure in the initial patent and a disclosure in the second patent, the earlier non-disclosure is completely cured by the subsequent disclosure of the reference in question. Your Honor asked earlier whether we're relying exclusively on pharmacia. We think pharmacia is very important and we think it is the answer to this case, but it's also not the only answer. It's not the only case that addresses this question. And I would also call Your Honor's attention to the Supreme Court decision in Keystone Driller, which this Court implemented and consolidated the aluminum against Fosseco. And what's particularly important about Keystone Driller, in our view, in my view, Keystone Driller and pharmacia both end up in the same place. In Keystone Driller, the second patent is going to be enforceable unless there's a necessary immediate relationship between the wrongdoing in the first patent and the relief that's being sought in the second. Essentially, that boils down into exactly what pharmacia articulates, that the separate patent is going to be enforceable unless the separate patent was obtained by inequitable conduct. So I see pharmacia and Keystone as basically being two sides of the same coin saying the same thing. If we can leave the – I think we've gotten the tainting issue down. So now, assuming that we would reach the second issue, the underlying issue of inequitable conduct, let me ask you, is there any dispute that Dr. Fishel read the letter sent by the attorney Rosenberg and the search report that was included in the letter or attached to the letter? There's no dispute as to the first. There's dispute as to the second. He unquestionedly testified that he read the search report, and the search report said the only – He read the – he did read the search report. I'm sorry. Excuse me. I misspoke. Okay. He read the letter from his counsel. The letter from counsel said the only significant reference with respect to Claim 1 is the Skrow reference, and he then went and focused on Skrow. But in order to find Skrow, wouldn't he have had to identify Skrow by looking at the search report attached? I mean, I can't remember. I have the letter and the search report here. I don't have the search report in front of me. The search report has the name of the reference. The reference was in French. I know that he had Skrow translated from the French. Right. Claim 1 is European patent. So that lists the patent application. Let me compare that to – I was just going to compare the information on the search report to that information. So there's no indication, there's nothing that would lead us to conclude clearly that he read the search report. No, there is nothing. And, in fact, his testimony was that he had no recollection of reading – brought it to his attention in May of 1998, and that was the first time that he became aware of Hillstead. And the district court cited that testimony in her opinion and didn't discredit it, but she didn't say that it's wrong. What she did say is that he buried his head in the sand and hadn't conducted a prior art search, and we just don't think that's a basis for finding inequitable conduct. We certainly don't think it's a basis for holding that as a subsequent patent where Hillstead was actually – Wait a minute. What she said was he purposely buried his head in the sand. And didn't – Not necessarily – I mean, you're saying because he didn't conduct a prior art search? I mean, she said he purposely buried his head in the sand. And she criticized him for not conducting a prior art search. But burying his head in the sand could have been getting this letter and not getting to the attached patent. And just to remind John that the letter enclosed the patent number for the Skrow patent, and it was in French, and then Dr. Pichelle obtained a copy of it and then obtained a copy of the French translation. My time is moving along, so if it's okay with the court, I'd like to address the next issue, which is literal infringement. Well, let me ask you quickly a question about this should have – well, heads in the sand issue. I think in response to Judge Proust, you were saying that you don't think that's a viable theory of inequitable conduct. I mean, where I'm going with this is the FMC against Hennessy case. This court said that one should not be able to cultivate ignorance or disregard numerous warnings that material information of prior art may exist. Merely to avoid actual knowledge of that information. In other words, head in the sand. That's a basis for finding inequitable conduct, as I understand that statement. You're not saying that that's not a valid, viable legal theory for inequitable conduct. I'm not saying that that's not a viable theory. What I am saying is that there's no evidence that that's what happened here. So your challenge then to that aspect of the trial judge's decision is a challenge to the evidence, not a challenge – I mean, you're saying that she's simply wrong in concluding that they put their heads in the sand. Not that that's not a sufficient legal basis on which to find inequitable conduct. I have to say that I find her decision on that point less than a model of clarity. We're not judging models of clarity here. And I understand that. But what I understand her to be saying is that Dr. Fischel was aware that – became aware over the course of prosecution that undulating longitudinals were commercially valuable and were an important aspect of his invention. And that notwithstanding that, he did not go out and conduct a prior art search. And that's what the court's referring to. And that, if I'm reading the decision correctly, I believe that would be legal error. If I could turn to the issue of literal infringement because my time is running quickly. On literal infringement, the dispute that the parties had related to the issue of undulating, the court defined undulating prior to the trial, and the case was tried on the basis of its construction. The construction – On that issue, again, on literal infringement, I think you say in your reply, Bruce, and I just want to make sure this is correct, that the instruction that was given was BSC's requested instruction. Is that correct? That's correct. All right. It was the construction BSC proposed. Okay. And the dispute that we had during claim construction isn't exactly accurately represented by BSC in their brief, but the construction was, does an undulating section have to have one crest or one trough, which is what we proposed, or two – or – I'm sorry. We proposed one crest or one trough. They proposed one crest and one trough. And the district court adopted – the district court's construction was defined undulating to mean rising and falling in waves, thus having at least one crest and one trough. Did she say anything about the meaning of the term crest? No. Okay. No. So the only thing we're left on that is the dictionary definition. If I could just focus on the two parts of that construction. The first part, rising and falling in waves, talks about rising and falling. The wave portion of that talks about how the rising and falling needs to be done. It has to rise and fall in waves. It can't rise and fall in straight lines. That's not good enough. Rising and falling in waves is the shape. That's a standard dictionary definition of undulating. The court then adapted that construction by adopting the second portion, which says, thus having at least one crest and one trough, in order to harmonize the construction with the preferred embodiment, which has one crest and one trough. We produced evidence at trial that, like the preferred embodiment, the accused device, the near extent its undulating sections have not just one crest and one trough, but two crests and one trough. And we showed that through engineering drawings. We showed it through photographs. We showed it through expert testimony pointing out the crest and trough. And we showed it through other expert testimony as well. We believe it was ample evidence to support the jury verdict on literal infringement. And I'd love to say more about my time shortening out. I've got a little bit of time reserved for rebuttal. Thank you. Thank you. Mr. Graff. Bad knock, is it? Bad knock. Bad knock. Your Honor, it may have pleased the Court. Your Honor, we believe this is a case of very clear and equitable conduct in the parent application, and that that taints claims that are downstream in the continuation application, which are closely related. Now, on the taint issue, Mr. Glarner sort of thrown down the gauntlet and said there's no case that indicates that where there has been arguably inequitable conduct in patent one, but the nondisclosure is cured to the extent that a disclosure of what was not disclosed in connection with the first patent is disclosed in connection with the second. There is no case from this Court in which we have ever held the second patent to be unenforceable for inequitable conduct. Do you agree or disagree? We disagree. What case says that? Bristol-Myers for one. You certainly have the original prosecution. They don't disclose something. Then in the reissue, they do. Well, that's a reissue. Do you have one that's not a reissue, that's a separate patent, either a continuation in part, but not part of the same patent as in the same application or a reissue? Your Honor, I'm thinking of we've cited the Fox Industries case where I believe they made the statement that it would taint any claims in that patent or related patents. And we have the statement in Molan's where they were downstream. They didn't even try to argue it was a cure. I can't, as I stand here right now, give you an example I know of a specific case where it didn't occur in the first one and then it occurred in the second one. But my understanding of the law, I don't think the law has ever been in doubt on this. If you have inequitable conduct, and then you simply continue the prosecution in a related downstream case, a continuation or a divisional, a related. This case, was this a divisional in this case? This is a continuation. Continuation. Right. But what do you make of the language in Pharmacia, which at least portions of it are quite broad? It says this court's inequitable conduct cases do not extend inequitable conduct in one patent to another patent that was not acquired through coverable conduct. And isn't that statement broad enough to cover the facts in this case? I think, with all respect, Your Honor, I think that that statement is overly broad to the extent that it purports to say that if you simply refile the case and continue the prosecution of the same or related claims, that inequitable conduct doesn't affect those. And here's why, if you think about it. If you do exactly what happened here, the issue had become in the prosecution undulations, whether there was undulations. They represented to the patent examiner during the prosecution of the parent that nothing in the art showed undulations. Then they amended all the claims to add undulation, except for one irrelevant claim on bimetal. And after they did that, they relied on that fact to distinguish the art that the examiner was citing. And then they got the patent allowed. And after they did that, and after they relied on that, when they were sitting on the one reference which the European search report told them was particularly relevant to claim eight, which was the one that had undulations in the foreign case. After they did that, then Cordes comes along and says, well, OK, so let's straighten this out.  There's a memo in the record in which the thing they want to talk about, the only issue in the prosecution, they need claims in the new case now that are going to be allowable over Hillstead. And then they put in with 60 references, they just put in Hillstead, and they never tell the examiner that, hey, here's the one that relates to undulation. They don't go back and tell them what the issue even was. And that's why you can't do that. If you think about it, if you could commit inequitable conduct, fool the examiner and mislead him, get your certain claims allowed, and then refile the case and put a new number on it and continue and whitewash it, I mean, inequitable conduct would be completely, it would undermine the doctrine completely if you could do that. Well, in your discussion there, you just sort of walked over the other portion of the inequitable conduct, which we asked the other counsel about, which is, I mean, you said, I think they can just sit on this letter and this foreign application. But the question is, is it not, I mean, it's relevant whether they sat on it and read the enclosures or not, right? Absolutely. And how do you read the district courts? How would you construe the district court statement that they purposely put their head in the sand? What is that referring to? That's referring to the fact that, at best, they had this reference. They had seen it. It was called to their attention. They were told it was material to the issue in the prosecution. It was particularly relevant. And instead of disclosing it. Wait, wait, wait, wait, let me stop you there. They were told it was material to the reference in question. Where were they told it was material? In the European search report, Your Honor. In the search report. But let's assume for a moment that she didn't find them not credible and there's no conclusion that they read the search report. So they read the letter. That's the only thing we know, correct? So why does what's in the letter lead her to conclude that they purposely put their head in the sand? Not going any further. I think, Your Honor, two things. First of all, I think they did read the reference. How do we know? Because he testified it was his practice to read them. He read them all. He said that. Well, I'm reading from 4648 of the appendix. And he says, I have no recollection of looking at anything except Zegro. I have no recollection at that time. And then he makes the strange statement that she seems inconsistent with that. I looked at them all. But then he follows up after questioning. I have a recollection that I was completely unaware of the Hilstead patent until about April of 98. Absent at least a finding by the trial judge that he actually, the truth of the matter was that he's not telling the truth when he says he doesn't have a recollection. He didn't read them in 95, but he didn't see them until 98. How can we assume that he was aware of them based on this evidence and the absence of a finding? The only finding on this is her finding, as far as I can tell, that Fischel and Rosenberg testified they didn't look at the patent. I think, Your Honor, the answer is if there's a search report that comes in under that letter, there's only six patents. It's not a big bundle or something. There's only six patents. At that point, they're alone. They're under a duty to disclose that. Well, that's a different question from whether there was actual notice. Right. I mean, once you cross that line, then you're into the should have known duty of inquiry, et cetera, which is a different kettle of fish. What I'm looking for is where it is that you find the basis for saying that there was knowledge of the Hillstead patent as of the middle of 95. I think the only thing we can say is that they clearly had it in hand, Your Honor, and instead of disclosing it like they should have, like the Mullins case said they should, like the manual says they should, right there on that ground alone, they went and put it in the file even though they knew and were told that this went right to the only issue that was key in the prosecution. And even though you do have, I agree, the testimony is ambiguous, but he does say it was his practice to go through, look at references, look at the pictures. He did say in the passage that Your Honor just read, I looked at them all. He then tries to say to get out of it, oh, well, I just don't recall until 1998. I don't recall seeing it. So did she impute knowledge, do you think, impute knowledge that they had actually read the Hillstead patent or impute knowledge that they at least appreciated that it was somehow relevant and material? I think she did both, Your Honor, and she also concluded, and this of course backs her up, that to the extent that they didn't, they were purposefully putting their head in the sand. They can't do that. When the only issue in the prosecution is whether or not this has undulations. To the extent that they did not do what were they putting their head in the sand? That they did not look at the Hillstead patent, which was right in front of their nose when they received it, and it was called to their attention as the only one that went right to the issue of undulations, the one that was particularly relevant to Claim 8 in Europe, the only undulation claim. At the very time when undulation is what they're relying on to get the patent. So I'm sorry to interrupt, the time is limited. How do we get to her other conclusion, which says that they knew or should have known about the materiality? What is the predicate for finding that they knew or should have known the materiality? Is it step two, once she imputes knowledge that they read Hillstead, then she concluded that having read Hillstead, they knew or should have known of the materiality? It's that plus the fact that it's highly material. Did she find it was highly material? She found that they met the thresholds of both materiality and intent. And this was the most critically material reference you could have. It goes to exactly the point of novelty in the prosecution. But she concluded that they wouldn't have known that it was material unless we impute knowledge that they read it. They have to open the envelope and take it out and look at it. With respect at least to Fischel, we don't have any basis for concluding that there's certainly not a finding to that effect. You say in your brief that she implicitly found that. I don't see an implicit finding. Where is it that she implicitly makes a finding? With respect to Fischel. Now there is evidence with respect to Rosenberg that he looked at Hillstead. But we don't seem to be arguing about Rosenberg here. We're arguing about Fischel. That's correct, Your Honor. We're arguing about Fischel. And the fact is you won't get ever a flat admission smoking guns. No, but you can have a finding. The district judge can say I heard the testimony and I find that he looked at it. But there isn't any finding like that. Now I think the finding is that these circumstances met the threshold level of material intent and they deliberately put their head in the sand under these circumstances. When you realize it's the most highly material thing you could have, they receive it and right at the time they're prosecuting on it and they go and stick it in the file instead of doing what they should have. And then they later, after they have a memo that says the key issue, we need to get claims that distinguish Hillstead, that memo's in the record. Then they go and they simply put it in with 60 other references and they don't say a word about the undulations or the issue. They don't do anything at all to cure the inequitable conduct that's already occurred. Wouldn't you have an easier road if you were to read her opinion as saying the new one should have known of the materiality was not based on an imputed reading of the actual patent, the Hillstead patent, but just based on the letter or the search report? Could you say that just reading the letter or just reading the letter and the search report, he should have known, even if he never turned the next page and looked at the Hillstead patent, that he should have known the materiality of the reference? I think both are true, Your Honor. But do we know which of those the judge, what her theory was in reaching her conclusion? I think the judge concluded it was material and that they were putting their head in the sand not to look at the envelope they got. It wasn't a box full of patents. Not to look at the Hillstead patent. Not to look at it when they got it. Can I just ask one quick question about Rosenberg? You're not pressing, are you? I mean, Rose, the attorney did take over the prosecution of the 312 patent at the end. Correct. But you're not suggesting, it seems not to be an issue in this case, that he, therefore, was responsible because he didn't disclose it and his knowledge and so forth. Well, I think they both put their head in the sand, Your Honor. I think that's clear. But she heard extensive testimony from Dr. Fischel. And that testimony, incidentally, ended clearly on a situation in which it was clear he was giving false testimony. He had previously given false testimony to cut out prior investors. That was the conclusion of three hours of testimony that she heard. That's why I think it was clear that that's who she was not believing when she said they were putting their head in the sand. So your legal argument here is predicated on Fischel, not on Rosenberg. It's predicated on both, Your Honor, but it's primarily Fischel. That's correct. That's who the district court inferred had an intent to deceive. With respect to the question of head in the sand liability for inequitable conduct, what do you think are the best cases of this court that uphold that theory of liability? I think the one Your Honor just mentioned is good on that. You mentioned, I believe, FMC against Hennessey. Yes. Right. And I think there's others we've cited in the brief on just that point. My time is running low. I just want Criticon, I'm told. Criticon? That's a good one. Oh, OK. I hope you can do better than Criticon. All right. Rasselier. Rasselier is another case that looks. I just want to say one word on the infringement issue because my time is running out right now. The infringement issue, the difference. The judge didn't try to change the construction here. They tried to change the construction. There was no question. We cited this clearly in the brief what crest and trough were arcing curves. That was understood. That was always understood. Not only that, remember the definition requires rising and falling in waves. They had absolutely no evidence of waves plural. But the instruction that the judge gave to the jury was the one that you requested, correct? That's correct. And it did say waves plural, Your Honor. They had no evidence of that. She was correct. The way they got the jury confused was they had this dependent claim that said where the undulating section is a U-shaped curve and comprises a U-shaped curve, which, of course, is open-ended. It doesn't mean there's only one curve. And the jury, they kept hammering you, you, you. And that's what they believe. And that's how they got confused. There was no evidence that it was rising and falling in waves plural. And so the judge's J-mole on that is clearly correct. All right. Mr. I'd like to just when Your Honor asked Mr. whether there are cases in which this court has held that nondisclosure and patent day will take patent being where a reference was in fact disclosed. The one case that you mentioned was Fox. And in Fox, that doesn't describe the facts in Fox. In Fox, there was a continuing nondisclosure. The continuing nondisclosure persisted through all of the patents. The relevant reference was never disclosed. And the court was never confronted with the issue that this court faces in this case. To be fair, Mr. Badenock cited dicta from Fox. He was referring to the language where it said that a nondisclosure or inequitable conduct may result in a subsequent taint. And this court addressed that dicta in its later decision in Baxter, if I'm remembering correctly, and considerably narrowed the scope of that dicta and made clear that it does not have the broad input that Boston Scientific would give it. The one other fact that I would mention about Fox and the Fox dicta is that the author of Fox has had the last word on the subject because he's also the author of Pharmacia, Judge Rader. So I think Judge Rader in Pharmacia provided a pretty clear view of how the Fox dicta should be read. The other issue that I'd like to address was the questions that were coming up. If you make an effort to square the two cases, you can actually resolve any inconsistency in one of two ways, one of which is not favorable to your client. Whoever speaks last speaks best. I see. And in all seriousness, the intervening decision in Baxter also reads the Fox dicta very narrowly. But I think not altogether out of the law. If the broad reading of Pharmacia is correct, it would seem to me that there are essentially no more taint cases. Viewing a taint case is one in which, unless there's an independent basis for inequitable conduct in patent number two, there is no inequitable conduct that stems from patent number one. Or under Consolidated and Keystone Driller, unless the taint in the first patent so permeates and spills over into the second patent that it has an immediate and necessary relationship with the issues of the second patent. But once you accept that qualification, aren't you swallowing the camel? I think you're in the same test. I think that Pharmacia and Keystone Driller essentially provide the same test that inequitable conduct in patent number one does not taint patent number two unless whatever happened before would support a finding that patent number two was itself procured by inequitable conduct. And that's my understanding of the law from Keystone Driller and from, if I could just, just one minute, there was a discussion of imputing knowledge. And one of the things that differentiates this case from other inequitable conduct cases, and I think a fairly significant way, is that we waived attorney-client privilege. We opened up the books. We disclosed all the communications between Dr. Fischel and his attorneys. And in other cases where there's that kind of disclosure, what you find is that the withheld reference to support a finding of intent is in the forefront of people's minds. People are thinking about it. That's what you see in cases like Criticon. You see that the reference was viewed as critical, and then it's concealed. And in that situation, people may deny knowledge of materiality. But where the record with disclosure of attorney-client materials shows a focus on it, then in those cases it's proper to impute a knowledge of materiality. Here you don't have anything like that. That's sufficient. Thank you, Your Honor. Thank you. The case is submitted. Thank you.